IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HEART TO HEART HOSPICE OF FORT WORTH, LLC 6100 Southwest Blvd., Suite 200 Fort Worth, TX 76109 <br><br> Plaintiff, <br> v. <br><br> XAVIER BECERRA, in his official capacity as Secretary, United States Department of Health and Human Services, 200 Independence Ave. S.W. Washington, DC 20201, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. _____ |

**COMPLAINT FOR JUDICIAL REVIEW**

Plaintiff, Heart to Heart Hospice of Fort Worth, LLC, brings this Complaint for Judicial Review against Defendant Xavier Becerra, in his official capacity as Secretary of Health and Human Services, for violations of law in the design and execution of the statistical sampling and the calculation of an alleged overpayment amount, plus interest, on claims submitted to Medicare, for the audit review period June 15, 2016 to May 22, 2020, and asserts as follows:

I. **PARTIES**

1. Plaintiff Heart to Heart Hospice of Fort Worth, LLC ("Heart to Heart Fort Worth" or "Plaintiff") is a Texas limited liability company that provides hospice care to patients with life-

limiting illnesses, with its principal place of business at 6100 Southwest Blvd., Suite 200, Fort Worth, TX 76109.[1]

2.      Heart to Heart Fort Worth is a wholly owned subsidiary of Heart to Heart Hospice Holdings, LLC ("Heart to Heart Holdings"), which has its headquarters and principal place of business at 7240 Chase Oaks Blvd., Plano, TX 75025.

3.      Heart to Heart Holdings is the holding company of established hospice providers throughout Texas, Indiana, and Michigan.

4.       Heart to Heart Hospice of Texas, Ltd. ("Heart to Heart Texas") is another wholly owned subsidiary of Heart to Heart Holdings, providing hospice care to patients with life-limiting illnesses, with its principal place of business at 1406 Halsey Way, Suite 110, Carrollton, TX 75007.

5.      Heart to Heart Hospice of Houston, LLC ("Heart to Heart Houston") is another wholly owned subsidiary of Heart to Heart Holdings, providing hospice care to patients with life-limiting illnesses, with its principal place of business at 100 Interstate 45 N, Suite 320, Conroe, TX 77301.

6.      Heart to Heart Hospice of Greater Houston, LLC ("Heart to Heart Greater Houston") is another wholly owned subsidiary of Heart to Heart Holdings, providing hospice care to patients with life-limiting illnesses, with its principal place of business at 16441 Space Center Blvd., Suite C-300, Houston, TX 77058.

7.      Plaintiff has completed all necessary requirements to be a Medicare provider.

8.      Plaintiff is enrolled in the Medicare program pursuant to a Medicare Enrollment Application submitted to the Centers for Medicare and Medicaid Services ("CMS").

---

[1] Heart to Heart Fort Worth previously had an address of 5608 Malvey Ave., Suite 301, Fort Worth, TX 76107.

9.    Plaintiff follows all applicable federal statutes and regulations, and has been enrolled as an inpatient hospice care provider in the Medicare program at all times herein.

10.    Defendant, Xavier Becerra, is named in his official capacity as the Secretary of the Department of Health and Human Services ("Secretary" or "Defendant"). The Secretary's responsibilities include implementing and administering the Medicare program under Title XVIII of the Social Security Act, as amended, 42 U.S.C. § 1395 *et seq*.

11.    The Secretary administers the Medicare program through CMS, which is an agency of the Department of Health and Human Services ("HHS"). *Id.*

12.    CMS also oversees and directs its Medicare contractors (*see infra* Section V.A.), who are responsible for handling the first two levels of administrative review of Medicare denials.

13.    The Office of Medicare Hearings and Appeals ("OMHA") conducts the third level of administrative review in the Medicare claims appeal process and operates separately from the other contractors involved in the appeal process.

14.    The Medicare Appeals Council ("Council")—a component of the Departmental Appeals Board ("DAB") within HHS—provides the fourth level of administrative review.

15.    All references to the Secretary herein are intended to include CMS, its contractors, and any of their successors or predecessors.

## II.    JURISDICTION AND VENUE

16.    This action arises under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, and the Fifth Amendment of the United States Constitution.

17.    This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g) as applied to Medicare appeals by 42 U.S.C. § 1395ff, which authorizes judicial review of a final agency decision of the Secretary.

18.    Plaintiff is filing suit after receiving a final decision of the Secretary denying coverage of its Medicare claims and affirming an extrapolated overpayment and, therefore, has exhausted its administrative remedies.

19.    Courts have held that where plaintiffs have bypassed the Council in following the prescribed rules at 42 C.F.R. § 405.1132(a)–(b), "the [Administrative Law Judge's] opinion stands as the final decision of the Secretary" and "[j]udicial review of such final decisions lies with [a federal court] pursuant to 42 U.S.C. § 1395ff(b)(1)(A), which incorporates 42 U.S.C. § 405(g) and allows for judicial review of a final decision of the Secretary with respect to Medicare[.]" *Prime Healthcare Servs.—Montclair, LLC v. Hargan*, No. 17-cv-659, 2018 WL 333862, at *5 (C.D. Cal. Jan. 9, 2018).

20.    The amount-in-controversy is greater than $1,850 as required by 42 U.S.C. §§ 1395ff(b)(1)(E)(i) and 1395ff(b)(1)(E)(iii).

21.    This suit is timely filed within 60 days of the date that Council was required to respond to Heart to Heart Fort Worth's request for escalation to federal court, as prescribed by the rules governing escalation. *See* 42 C.F.R. § 405.1132(a)-(b); *see also* 42 C.F.R. §§ 405.1006(c), 1136(a)(1).

22.    Venue is proper in this Court as Plaintiff's principal place of business is located in the District. 42 U.S.C. § 405(g); 42 U.S.C. § 1395ff(b)(1)(A).

## III.    STANDARD OF REVIEW AND SCOPE OF AUTHORITY

23.    A federal district court's review of a final decision of the Secretary as to Medicare coverage is limited to: (i) whether the Secretary's factual findings were supported by substantial evidence; (ii) *de novo* review of conclusions of law; and (iii) whether the Secretary's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 42 U.S.C. § 405(g); 5 U.S.C. § 706(2)(A); *Shah v. Azar*, 920 F.3d 987, 991 (5th Cir. 2019); *Clinic Res. Mgmt.*

4

*v. Burwell*, No. CIV.A. H-14-578, 2015 WL 3932657, at *5 (S.D. Tex. June 26, 2015) ("The court applies de novo review to the Secretary's determinations of questions of law[.]"); *Hendricks v. Bowen*, No. S-87-184-CA, 1989 WL 280362, at *2 (E.D. Tex. Aug. 31, 1989).

24.     Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).

25.     "While deferential, the substantial evidence test is not intended to constitute a rubber stamp for the agency decision." *Cypress Home Care, Inc. v. Azar*, 326 F. Supp. 3d 307, 327 (E.D. Tex. 2018). In other words, a "speculative, conclusory statement does not constitute substantial evidence." *Id*. at 328 (*citing Amalgamated Clothing Workers of Am., El Paso Dist. Joint Bd., AFL-CIO v. N.L.R.B.*, 491 F.2d 595, 598 (5th Cir. 1974)).

26.     The court's factual review is usually limited to the administrative record. *See Mathews v. Weber*, 423 U.S. 261, 263, 270 (1976) (holding that under 42 U.S.C. § 405(g), the "court may consider only the pleadings and administrative record" and "neither party may put any additional evidence before the district court").

27.     However, there are exceptions to this general rule. Discovery and supplementation of the administrative record are appropriate where (1) "there was such failure to explain administrative action as to frustrate effective judicial review," (2) it appears that the agency has relied on substantial records and materials not included in the record, or (3) "supplementation of the record through discovery is necessary to permit explanation or clarification of technical terms or subject matter involved in the agency action under review." *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973) (*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Pub. Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982); *see also Fratellone v. Sebelius*, No. 08

CIV. 3100 RME RLE, 2009 WL 2971751, at *3, *7 (S.D.N.Y. Sept. 16, 2009) (opting to "consider [plaintiff's affidavit] as an aid to understand and highlight [plaintiff's] position" and because it assisted the "court in navigating through a plethora of medical terminology and files, which ma[d]e up the administrative record, and help[ed] th[e] Court address the narrow issue of whether or not the Secretary's decision was supported by substantial evidence.").

28.    The assessment of whether substantial evidence supports a decision of the Secretary requires the court to review the administrative record as a whole. This includes looking at evidence supporting the Secretary's position, as well as other evidence that detracts from it. *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985); 5 U.S.C. § 706. HHS "has codified [this] requirement in a regulation that directs the Office of Medicare Hearings and Appeals . . . to include in the record 'the appealed determinations, and documents and other evidence used in making the appealed determinations and the ALJ's or attorney adjudicator's decision,' as well as any proffered evidence excluded by the adjudicator." *Goffney v. Becerra*, 995 F.3d 737, 747 (9th Cir. 2021) (quoting 42 C.F.R. § 405.1042(a)(2)).

29.    In contrast to the deference due to findings of fact, the Secretary's (or in this case Administrative Law Judges' ("ALJs") or Council's) conclusions of law are reviewed *de novo*, and failure to apply the correct legal standards is grounds for reversal. 42 U.S.C. § 405(g); *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004); *see also Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir. 1995); *Baylor Cnty. Hosp. Dist. v. Burwell*, 163 F. Supp. 3d 372, 377 (N.D. Tex. 2016), *aff'd sub nom. Baylor Cnty. Hosp. Dist. v. Price*, 850 F.3d 257 (5th Cir. 2017) (noting that Courts will "set aside fact findings which are not supported by substantial evidence and will correct errors of law") (internal quotation marks omitted).

30.    Pursuant to the APA, the Secretary's final decision may also be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *Buffalo Marine Servs. Inc. v. U.S.,* 663 F.3d 750, 753 (5th Cir. 2011); *C. A. White Trucking Co. v. U.S.*, 555 F.2d 1260, 1264 (5th Cir. 1977).

31.    To meet the requirements of the APA, an agency must "examine the relevant data and articulate a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (internal citations omitted).

32.    In reviewing that explanation, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

33.    An agency will have acted arbitrarily and capriciously where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

34.    An agency will have failed to act in accordance with law where it acts contrary to "any law, and not merely those laws that the agency itself is charged with administering." *F.C.C. v. NextWave Pers. Commc'ns., Inc.*, 537 U.S. 293, 300 (2003) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) ("In all cases agency action must be set aside if the action was . . . not in accordance with law or if the action failed to meet statutory, procedural

or constitutional requirements." (internal quotations omitted)) (*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977))).

35.　　In reviewing a final agency decision in the Medicare appeals context, federal district courts "have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Secretary]." 42 U.S.C. § 405(g).

36.　　Federal district courts have broad statutory jurisdiction to grant relief on judicial review of a final agency decision. *See Smith v. Berryhill*, 139 S. Ct. 1765, 1779 (2019) (describing courts' "broad grant of authority" under 42 U.S.C. § 405(g)).

37.　　Courts' broad grant of authority includes the authority to set aside an extrapolated overpayment demand where it is found to be procedurally invalid. *See, e.g.*, *Cent. La. Home Health Care, LLC v. Price*, No. 17-cv-00346, 2018 WL 7888523, at *25 (W.D. La. Dec. 28, 2018); *Cypress Home Care, Inc. v. Azar*, 326 F. Supp. 3d 307, 329 (E.D. Tex. 2018).

38.　　Moreover, the Supreme Court has historically found that while "[c]onstitutional questions obviously are unsuited to resolution in administrative hearing procedures," such questions are suited for federal courts, even when not raised in initial administrative proceedings. *Califano v. Sanders*, 430 U.S. 99, 109 (1977); *Mathews v. Diaz*, 426 U.S. 67, 76–77 (1976).

## IV.　HIERARCHY OF AUTHORITY

39.　　Where there is a conflict between a statute and a regulation, or a statute and CMS guidance manuals, such as the Medicare Program Integrity Manual ("MPIM"), the statute will govern. *See Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134 (1936) (noting that a regulation operating to create a rule out of harmony with a statute is a "mere nullity") (overruled on other grounds by *Johnson v. Apfel*, 189 F.3d 561, 563 (7th Cir.1999); *Southland Royalty Co. v. Fed. Energy Admin.*, 512 F. Supp. 436, 446 (N.D. Tex. 1980).

40.    Relatedly, where two possible interpretations exist, and one conflicts with an existing statute, the non-conflicting interpretation will govern. *See Manhattan Gen. Equip. Co.*, 297 U.S. at 194 (noting that a regulation operating to create a rule out of harmony with a statute is a "mere nullity"); *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937) (noting it is a "cardinal principle of statutory construction" that "as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act"); *Epic Sys. Corp. v. Lewis*, 138 S. Ct 1612, 1624 (2018) ("[R]ules aiming for harmony over conflict in statutory interpretation grow from an appreciation that it's the job of Congress by legislation . . . both to write the laws and to repeal them); *see also infra* Sections VI.F. and VIII.A.

41.    The Federal Regulations governing the Medicare claims appeal process illustrate the above hierarchy. *See generally,* 42 C.F.R. §§ 405.1060, 405.1062, 405.1063.

42.    These regulations state, in relevant part, that "[a]ll laws and regulations pertaining to the Medicare and Medicaid programs . . . are binding on ALJs and attorney adjudicators, and the Council." *Id.* § 405.1063(a).

43.    In contrast, ALJs and the Council "are not bound by [local coverage determinations] . . . *or CMS program guidance,* such as program memoranda and *manual instructions*[.]" *Id.* § 405.1062(a) (emphasis added).

44.    The Social Security Act itself also explicitly notes that unless promulgated as a regulation by CMS, "[n]o rule, requirement, or other statement of policy (other than a national coverage determination)" can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program. 42 U.S.C. § 1395hh(a)(2).

45.     The statistical sampling and extrapolation guidelines set out in the MPIM are entitled only to *Skidmore*[2] deference. *Rio Home Care, LLC v. Azar*, No. 17-cv-116, 2019 WL 1411805, at *26 (S.D. Tex. Mar. 11, 2019) (citing *Baylor Cnty. Hosp. Dist. v. Price*, 850 F. 3d 257, 261–64 (5th Cir. 2017) (applying *Skidmore* deference to CMS' State Operations Manual)).

46.     An agency's interpretation of an interpretive manual, such as the MPIM, is not afforded any deference. *Elgin Nursing & Rehab. Ctr. v. Dep't of Health & Human Servs.*, 718 F.3d 488, 494 (5th Cir. 2013) (declining to defer to HHS' interpretation of a provision of the State Operations Manual).

## V.     MEDICARE PROGRAM

47.     Congress enacted the Medicare Program in 1965 under Title XVIII of the Social Security Act to provide health insurance primarily to individuals sixty-five years of age and older, disabled persons, and those with end-stage renal disease. Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286 (1965) (codified as amended at 42 U.S.C. §§ 1395-1396v).

48.     The Medicare Program seeks to ensure that its beneficiaries have access to health care services. *Id.* at 286.

49.     The Medicare Program is made up of four separate parts—Part A, Part B, Part C, and Part D.

50.     As relevant to this matter, Medicare Part A refers to the medical insurance program authorized under Part A of Title XVIII of the Social Security Act. 42 U.S.C. §§ 1395c, 1395d; 42 C.F.R. § 400.202. Part A covers certain services, including inpatient hospital care, skilled nursing facility care, hospice care, and home health care. 42 U.S.C. § 1395c.

---

[2] *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-140 (1944) (*superseded on other grounds by statute*).

51.     Providers and suppliers enroll in the Medicare Program by completing an application and undergoing a certification process to verify their licensing and other credentials. Providers and suppliers enroll with the Medicare Administrative Contractor ("MAC") for CMS to administer claims for the Medicare benefit category applicable to the provider or supplier's covered services for the geographic locale in which the provider is physically located. 42 C.F.R. § 421.404(b)(1), (c)(1).

52.     Under Medicare Part A, beneficiaries pay a monthly premium to receive coverage for the various forms of medical services that are discussed at 42 U.S.C. §§ 1395c, 1395d.

53.     Federal courts have recognized that Medicare Part A beneficiaries "have a property interest in coverage under Medicare Part A that is cognizable under the Due Process Clause." *Barrows v. Becerra*, 24 F.4th 116, 133, 140 (2d Cir. 2022).

54.     While beneficiaries are the primary parties in interest to Part A of the Medicare program, providers and suppliers are likewise parties in interest as assignees of the beneficiaries. *See* 42 C.F.R. § 424.51 (noting that Medicare will generally directly pay "the provider for services furnished by a provider"); Medicare Claims Processing Manual, CMS Pub. 100-04, Ch. 29 § 110 (defining an "assignee" as a provider or supplier "who has furnished items or services to a beneficiary and has accepted a valid assignment of a claim").

55.     Although the Fifth Circuit has not definitively ruled that providers have a valid property interest in receiving Medicare payments, several district courts within the Fifth Circuit have found a property interest in Medicare payments. *See, e.g., Med-Cert Home Care, LLC v. Azar*, 365 F. Supp. 3d 742, 751 (N.D. Tex. 2019) ("Precedent makes clear that Med-Cert has a valid property interest in receiving Medicare payments for services rendered"); *Fam. Rehab., Inc. v. Azar*, No. 3:17-CV-3008-K, 2018 WL 3155911, at *4 (N.D. Tex. June 28, 2018), *order clarified*,

No. 3:17-CV-3008-K, 2018 WL 10419829 (N.D. Tex. Oct. 30, 2018) ("Family Rehab has a property interest in the Medicare payments for services rendered"); *see also Arthritis & Osteoporosis Clinic of E. Texas, P.A. v. Azar*, 450 F. Supp. 3d 740, 749 (E.D. Tex. 2020) (A&O Clinic has "a valid property interest in receiving Medicare payments for services rendered"); *Adams EMS, Inc. v. Azar*, No. CV H-18-1443, 2018 WL 5264244, at *10 (S.D. Tex. Oct. 23, 2018) ("Adams has a property interest in receiving and retaining the Medicare payments it has earned"); *Infinity Healthcare Servs., Inc. v. Azar*, 349 F. Supp. 3d 587, 596 (S.D. Tex. 2018) ("Plaintiff 'has a property interest in the Medicare payments for services rendered.'").

56.    When a hospice provider furnishes services to a Medicare Part A beneficiary, the provider submits a UB-04 claim for reimbursement based on the beneficiary's assignment of their property interest to the provider. At the time of enrollment in hospice, the beneficiary signs a separate document authorizing the medical provider to submit a claim for services, consistent with the requirements in 42 C.F.R. § 424.36(a).

57.    A number of district courts have recognized the rights of providers and suppliers under the Medicare Program, stating that "[t]he goal of payments under the Medicare scheme . . . is the reimbursement of health care providers for the cost of a single service or procedure[.]" *U.S. ex rel. Mikes v. Straus*, 84 F. Supp. 2d 427, 438 (S.D.N.Y. 1999); *Am. Med. Int'l, Inc. v. Sec'y, Health, Educ. & Welfare*, 466 F. Supp. 605, 626 (D.D.C. 1979) ("[t]he purpose of the Medicare [P]rogram is to reimburse providers for their reasonable costs.").

58.    In practice, when medical providers and suppliers, such as Heart to Heart Fort Worth, furnish services to a Medicare Part A beneficiary, the providers or suppliers thereafter submit a claim for reimbursement based on the beneficiary's assignment of their property interest to the provider or supplier.

59.     Medicare providers and suppliers are statutorily entitled to reimbursement for services rendered to Medicare Part A beneficiaries under 42 U.S.C. § 1395g.

60.     Providers and suppliers submit these claims for reimbursement to a MAC. 42 U.S.C. § 1395ff(a)(2)(A). As discussed in Section V.A.2 below, MACs are government contractors responsible for processing Medicare claims and making payments. 42 U.S.C. § 1395kk-1(a)(3).

### A.    Entities Involved in Medicare Claims Appeal Process

61.     While CMS is the HHS agency responsible for administering the Medicare program, CMS has contracted with various private entities to assist CMS in processing and auditing claims for reimbursement, and in the appeals process.

### 1.    Unified Program Integrity Contractors

62.     Payment decisions made by MACs are commonly audited by Unified Program Integrity Contractors ("UPICs"), in a process referred to as a "post-payment review" of certain healthcare providers. 42 C.F.R. § 421.304 *et seq.*

63.     CMS is authorized to contract with UPICs to fulfill program integrity functions for the Medicare Program. 42 U.S.C. § 1395ddd.

64.     The UPIC is authorized to: (i) prevent fraud by identifying program vulnerabilities; (ii) proactively identify incidents of potential fraud, waste, and abuse that exist within its service area and take appropriate action; (iii) investigate allegations of fraud; (iv) explore available sources of fraud leads in its jurisdiction; (v) initiate appropriate administrative actions where there is reliable evidence of fraud, including, but not limited to, payment suspensions and revocations; and, (vi) refer any necessary provider or supplier outreach to the provider outreach and education staff at the MAC. 42 U.S.C. § 1395ddd(b); 42 C.F.R. § 421.304; 42 C.F.R. § 405.371(a)(1); MPIM Ch. 4, § 4.2.2.1.

65.    UPICs are tasked with identifying both overpayments and underpayments. *See, e.g.*, 42 U.S.C. §§ 1395ddd(b), 1395g(a); 42 C.F.R. § 421.304; MPIM Ch. 8, §§ 8.4.1.3, 8.4.6.3, 8.4.5.2, 8.4.7.1.

66.    Each UPIC is designated to perform its duties for a specific geographic jurisdiction of the country. *See, e.g.*, CMS, *Review Contractor Directory - Interactive Map* (Dec. 1, 2021), https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-FFS-Compliance-Programs/Review-Contractor-Directory-Interactive-Map.

67.    UPICs are awarded one of CMS' five UPIC multiple-award indefinite-delivery, indefinite-quantity ("IDIQ") contracts for the five UPIC geographic jurisdictions, and these IDIQ contracts contemplate a "cost plus award fee" payment model. *See, e.g.*, GAO, *Decision in re AdvanceMed Corp.*, B-415360; B-415360.2; B-415360.3, at 2 (Dec. 19, 2017); *see also* CMS, *UPIC Task Order Statement of Work*, *Jurisdiction 1*, at 1 (July 17, 2015), https://sam.gov/opp/c5df515b5cf3afcb0d8fcd4e20c7acba/view#attachments-links.

68.    Generally, UPICs are paid a base fee in addition to an award fee that is awarded based on quality (e.g., accuracy, timeliness, and efficiency in performing tasks), management (i.e., how the UPIC communicates and coordinates with stakeholders), and certain other areas, such as innovation and value-added work. *See* CMS, *UPIC Jurisdiction 1 Award Fee Plan*, at 2–3, 6 (July 17, 2015), https://sam.gov/opp/c5df515b5cf3afcb0d8fcd4e20c7acba/view#attachments-links.

69.    In addition, starting in year two of a contract or task order, the UPIC has the potential for an "Excellence Award" that will be based on the Center for Program Integrity ("CPI") reaching its Return on Investment ("ROI") and the UPIC itself achieving high marks in its evaluation. *Id.* at 9–11.

**2.    Medicare Administrative Contractors**

70.    CMS contracts with MACs to process and audit claims that have been submitted by Medicare providers for payment in a particular geographic jurisdiction of the country. 42 U.S.C. § 1395kk-1(a).

71.    By statute, CMS is authorized to "enter into contracts with any eligible entity to serve as a [MAC.]" *Id.* § 1395kk-1(a)(1).

72.    MACs are statutorily authorized to perform the following functions: (i) determining the amount of reimbursement to providers and suppliers; (ii) paying such reimbursements to the applicable provider or supplier; (iii) providing education and assistance to Medicare Part A and B beneficiaries; (iv) providing consultative services to institutions, agencies, and others regarding maintenance of fiscal records necessary for reimbursement; (v) communicating with providers and suppliers regarding instructions from CMS; (vi) performing functions related to provider education, training, and technical assistance; (vii) developing local coverage determinations ("LCDs"), which are determinations "under [P]art A or [P]art B, as applicable, respecting whether or not a particular item or service is covered . . . under such parts" for the geographic zone assigned to the MAC; (viii) overseeing an improper payment outreach and education program; and (ix) such other functions as are necessary or as specified in CMS' agreement with the MAC. *Id.* §§ 1395kk-1(a)(4), 1395ff(f)(2)(B); 42 C.F.R. §§ 421.100, 421.200, 421.400.

73.    In addition, MACs handle provider and supplier enrollment, as well as redeterminations, which form the first level of the Medicare claims appeal process. 42 C.F.R. §§ 421.200, 421.404.

74.    Each MAC is designated to perform its duties for a specific geographic jurisdiction of the country. *See* 42 C.F.R. § 421.400(a); *see also* CMS, *Who are the MACs* (Dec. 1, 2021),

https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/Who-are-the-MACs#MapsandLists.

75.    Despite being jurisdictionally bound, MACs are required to follow federal statutes, regulations, and CMS program guidance.

76.    CMS structures its contracts with MACs as "cost-plus-award-fee" contracts, which are a type of cost-reimbursement contract allowing an agency to provide incentives to contractors if they achieve specific performance goals. *See, e.g.*, CMS, *Fact Sheet: Award of Medicare Administrative Contractor (MAC) Contract for Jurisdiction J* (Sept. 2014), https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/Downloads/Award-Background-J-J-Sept-2014.pdf; *see also* 42 U.S.C. § 1395kk-1(b)(1)(D)(i).

77.    Specifically, CMS is required to provide incentives to MACs to reduce improper payment error rates in their jurisdictions, which may include: (i) a sliding scale of award fee payments and additional incentives to MACs that reduce the improper payment rates in their jurisdictions to certain thresholds, or accomplish tasks that further improve payment accuracy; or (ii) substantial reductions in award fee payments under cost-plus-award-fee contracts for MACs that reach an upper end improper payment rate threshold, or fail to accomplish tasks that further improve payment accuracy. *Id.* § 1395kk-1(b)(1)(D)(ii)–(iii).

78.    In addition, CMS is statutorily mandated to use specific claims payment error rates or similar methodologies in processing and reviewing Medicare claims in order to give MACs an incentive to implement effective education and outreach programs to providers and suppliers. *Id.* § 1395kk-1(f).

### 3.      Qualified Independent Contractors

79.      Under 42 U.S.C. § 1395ff, CMS is mandated to "enter into contracts with qualified independent contractors to conduct reconsiderations of [redetermination decisions.]" Contracts between CMS and qualified independent contractors are to last for an initial term of three years and are renewable on a triennial basis thereafter. 42 U.S.C. § 1395ff(c)(1).

80.      A qualified independent contractor ("QIC") is statutorily required to be independent of any MAC or UPIC. *Id.* § 1395ff(c)(2), (c)(3)(K).

81.      The QIC must perform such duties and functions and assume such responsibilities as may be required by CMS to carry out the Medicare claims appeal process, "and shall have sufficient medical, legal, and other expertise . . . and sufficient staffing to make reconsiderations[.]" *Id.* § 1395ff(c)(3)(A).

82.      Each QIC is designated to perform its duties for a specific geographic jurisdiction of the country or by type of service. *See, e.g.*, CMS, *Second Level of Appeal: Reconsideration by a Qualified Independent Contractor* (June 23, 2022), https://www.cms.gov/Medicare/Appeals-and-Grievances/OrgMedFFSAppeals/ReconsiderationbyaQualifiedIndependentContractor.

83.      National coverage determinations ("NCDs"), CMS Rulings, Council decisions, and applicable laws and regulations are binding on the QIC. However, QICs are not bound by LCDs or CMS program guidance—though applicable regulations indicate that a QIC should "give substantial deference to these policies if they are applicable to a particular case." 42 U.S.C. § 1395ff(c)(3)(B)(ii)(I)–(II); 42 C.F.R. § 405.968(b)(1)–(2).

84.      Compensation provided by CMS to a QIC in connection with reconsideration reviews and decisions "shall not be contingent on any decision rendered by the [QIC] or by any reviewing professional." *Id.* § 1395ff(c)(3)(K).

85.     Similarly, any compensation provided by a QIC to a reviewer in connection with redetermination reviews and decisions must not be contingent on any decision rendered by the reviewer. *Id.* § 1395ff(g)(3).

### 4.    Administrative Law Judges

86.     OMHA is responsible for the third level of the Medicare claims appeal process, whereby a reconsideration decision by the QIC is reviewed by an OMHA adjudicator, and an ALJ hearing can be requested. 42 U.S.C. § 1395ff(b)(1); 42 C.F.R. §§ 405.1000–48.

87.     OMHA was created by the Medicare Modernization Act of 2003 in an effort to make the appeals process more efficient, and OMHA is functionally and organizationally independent of CMS. *See* Pub. L. No. 108-173, 117 Stat. 2066 (2003); *see also* CMS, MLN006562, Medicare Parts A & B Appeals Process (May 2021).

88.     A hearing may be requested before an ALJ under the regulatory requirements included at 42 C.F.R. § 1000.1014, where the request for hearing is filed within sixty calendar days after receipt of the notice of the QIC's reconsideration decision, and so long as the amount in controversy requirement is met. 42 C.F.R. §§ 405.1002, 405.1006.

89.     The purpose of a hearing before an ALJ is to provide important procedural due process protections to an appellant-provider/supplier, including "the opportunity to have a live hearing, present testimony, cross-examine witnesses, and submit written statements of law and fact." *Fam. Rehab., Inc. v. Azar*, 886 F. 3d 496, 499 (5th Cir. 2018); *see also Med-Cert*, 365 F. Supp. 3d at 753. In contrast, the Council "may, but is not required to, conduct additional proceedings, including a hearing." *Med-Cert*, 365 F. Supp. 3d at 753.

90.     In contrast to federal district courts, the scope of authority for ALJs is circumscribed. The Supreme Court has found that "[c]onstitutional questions obviously are

unsuited to resolution in administrative hearing procedures" and are generally left to federal courts, even when not raised in initial administrative proceedings. *Califano*, 430 U.S. at 109.

91.     An ALJ may review issues regarding failure to follow existing procedures, and other such issues that had been raised at the redetermination and reconsideration levels of the Medicare claims appeal process. *See* 42 C.F.R. § 405.1032(a).

92.     Where a provider or supplier disagrees with how a statistical sample and/or extrapolation was conducted, the provider or supplier must assert the reasons they disagree with how the statistical sampling and/or extrapolation was conducted in the request for an ALJ hearing. 42 C.F.R. § 405.1014(a)(3).

93.     CMS has made clear that this requirement to include the reasons for disagreement with how the statistical sample and/or extrapolation was conducted "does not limit the appellant's ability to provide additional information or arguments during the course of the appeal." Rather, the requirement exists to "provide the adjudicator with information on the appellant's basis for the appeal and is necessary to evaluate the record[.]" 82 Fed. Reg. 4974, 5033 (Jan. 17, 2017).

94.     The ALJ is required to conduct "a *de novo* review" and to issue a decision "based on the administrative record, including . . . any hearing record." 42 C.F.R. § 1000(d).

95.     The ALJ's decision "must be based on evidence offered at the hearing or otherwise admitted into the record, and shall include independent findings and conclusions." *Id.* § 405.1046(a)(1). Further, the ALJ's decision may not be based on extra-record documents. *Id.*

96.     CMS has explained that the "independent findings and conclusions" requirement is intended to express the requirement for *de novo* review and prohibits the ALJ from "merely incorporat[ing] the findings and conclusions offered by others" at the redetermination or reconsideration level. 82 Fed. Reg. 4974 at 5082, 5084.

97.    In addition to the specific reasons for the decision and a summary of any clinical or scientific evidence used in making the decision, the ALJ's decision must also include, "for any new evidence that was submitted for the first time at the OMHA level . . . a discussion of the new evidence[.]" 42 C.F.R. § 405.1046(a)(2)(i)–(ii).

98.    In issuing a decision, ALJs are bound by all laws and regulations pertaining to the Medicare program, including Title XVIII of the Social Security Act and applicable implementing regulations. CMS Rulings, precedential Council decisions, and NCDs are likewise binding on the ALJ. 42 C.F.R. § 405.1063.

99.    ALJs are not bound by LCDs or CMS program guidance, but will give substantial deference to these policies if they are applicable to a particular case. *Id.* § 405.1062(a).

100.    The ALJ must consider "all the issues for the claims . . . specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in [the appellant's] favor." *Id.* § 405.1032(a).

101.    Where an appellant "asserts a disagreement with how a statistical sample and/or extrapolation was conducted in the request for hearing[,] . . . in deciding issues related to how [the] statistical sample and/or extrapolation was conducted, the ALJ or attorney adjudicator must base his or her decision on a review of the entire sample to the extent appropriate to decide the issue." *Id.* § 405.1032(d).

102.    In conjunction with its review and decision, the ALJ has a regulatory duty to build the administrative record. This administrative record must include the originally-appealed decisions, the documents and other evidence used in making those appealed decisions, the ALJ's decision, and all other evidence. *Id.* § 405.1042(a).

103.    OMHA's ALJs have also been granted the authority to compel CMS and its contractors to produce documents related to the issues that are before an ALJ. Specifically, "[i]f an ALJ . . . believes that the written record is missing information that is essential to resolving the issues on appeal and that information can be provided only by CMS or its contractors, the information may be requested from the QIC that conducted the reconsideration or its successor." *Id.* § 405.1034(A). Missing information that "can be provided only by CMS or its contractors" is information that "is not publicly available, is not in the possession of, and cannot be requested and obtained by one of the parties." *Id.* § 405.1034(a)(2). It is also within the authority of ALJs to issue subpoenas to require entities—including those not party to an ALJ hearing—to produce existing documents. *Id.* § 426.405(c)(11).

104.    Relatedly, the Fifth Circuit has held that the effectuation of a final agency decision is "inextricably intertwined" with the agency's initial action, thus making effectuation an essential component of resolving ALJ appeals. *D&G Holdings, LLC v. Becerra*, 22 F.4th 470 (5th Cir. 2022).

105.    Effectuation includes an accounting of the amount of payment owed by a provider. Federal courts have made clear that "[i]t is inexcusable that the Secretary would allow [a MAC] to wield the sovereign authority of the United States to seize money from a private company but then be utterly unable to give an accounting for the amount pillaged." *D&G Holdings, LLC v. Azar*, 776 F. App'x 845, 848 (5th Cir. 2019).

106.    Given the regulatory authority granted to ALJs, it is in the purview of an ALJ to require that CMS or its contractor perform a full accounting of a provider's debts when missing documentation regarding the total amount recouped can only be provided by CMS or its contractors.

107.    The ALJ's decision on a request for hearing is binding on all parties unless "a party requests a review of the decision by Council within the stated time period or the Council reviews the decision issued by an ALJ . . . and the Council issues a final decision . . . or the appeal is escalated to Federal district court under the provisions at [42 C.F.R.] § 405.1132[.]" 42 C.F.R. § 405.1048(a)(1).

### 5.    Administrative Qualified Independent Contractor

108.    The Administrative Qualified Independent Contractor ("AdQIC") provides administrative, training, and case-file management support to QICs. *See* $Q^2$Administrators, *Who We Are*, https://www.q2a.com (last visited November 17, 2023).

109.    The AdQIC also "is the clearinghouse for all Original Medicare (Part A and Part B) claim case files and decisions from the OMHA field offices as well as any decisions and case files from the Appeals Council." Medicare Claims Processing Manual, CMS Pub. 100-04, Ch. 29 § 330.3.

110.    The AdQIC reviews OMHA decisions for possible agency referral to Council; if no agency referral is planned, the AdQIC will send the MAC an effectuation notice (i.e., a notice to "issue a payment or change liability"), a copy of the decision, and a summary of the associated claims from the Medicare Appeals System. *Id*.

111.    After receiving an OMHA decision and case file, the AdQIC has 10 days to update the appeals tracking system and to decide whether the case requires further review by Council (as discussed below), or to send the case to the MAC for payment. *See* $Q^2$Administrators, *FAQs*, https://www.q2a.com/Home/FAQ (last visited November 17, 2023).

112.    CMS or any of its contractors, including the AdQIC, may refer a case to Council anytime within 60 calendar days of receipt of an ALJ's decision or dismissal, "if, in their view, the decision or dismissal contains an error of law material to the outcome of the claim or presents a

broad policy or procedural issue that may affect the public interest." 42 C.F.R. § 405.1110(a)-(b); *see also* Medicare Claims Processing Manual, CMS Pub. 100-04, Ch. 29 § 340.1.

113.    For OMHA decisions issued by ALJs and attorney adjudicators, the AdQIC is responsible for reviewing ALJ and attorney adjudicator decisions and determining whether an agency referral is appropriate. Medicare Claims Processing Manual, CMS Pub. 100-04, Ch. 29 § 340.1.

114.    If the AdQIC refers the case to Council, the MAC that processed the original claim is notified, and effectuations (payment of claims) made by the contractor are then contingent upon the Council's decision. *See* Q²Administrators, *FAQs*, https://www.q2a.com/Home/FAQ (last visited November 17, 2023).

115.    For ALJ decisions that require no further review, the AdQIC sends an effectuation notice to the contractor, who must then initiate effectuation within 30 days and complete the process within 60 days. Medicare Claims Processing Manual, CMS Pub. 100-04, Ch. 29 § 340.2.

### 6.    Medicare Appeals Council

116.    Where a party is dissatisfied with the ALJ's decision, that party may appeal the ALJ's decision up to the Council, and the Council is statutorily authorized to review the ALJ's decision. 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1100(a), 405.1102(a)(1).

117.    The Council also may decide on its own motion to review a decision or dismissal issued by an ALJ. 42 C.F.R. § 405.1100(a).

118.    In reviewing the ALJ's decision, the Council is required to undertake a *de novo* review. 42 C.F.R. § 405.1100(c). In conducting its review *de novo*, the Council must consider all of the evidence in the administrative record. *Id.* §§ 405.1108(a), 405.1122(a)(1).

119.    As with ALJs, in conducting its review, the Council is bound by all laws and regulations pertaining to the Medicare program, including Title XVIII of the Social Security Act

and applicable implementing regulations. CMS Rulings, precedential Council decisions, and NCDs are likewise binding on the Council. *Id.* § 405.1063.

120.    The Council is not bound by LCDs or CMS program guidance, but will give substantial deference to these policies if they are applicable to a particular case. *Id.* § 405.1062(a).

121.    In reviewing an ALJ's decision, the Council will issue a final decision or dismissal order or remand a case to the ALJ within 90 calendar days of receipt of the appellant's request for review, unless that period is extended. *Id.* §§ 405.1100(c), 405.1108(a); 405.1128.

122.    As discussed in Section V.B.5, if Council does not issue a decision, dismissal or remand within 90 days, the appealing party may file a request to escalate the case to a federal district court for judicial review. *Id.* § 405.1132(a).

123.    Where the Council issues a decision, that decision will act as the final decision of the Secretary for purposes of 42 U.S.C. § 405(g) and § 1395ff(b)(1)(A) and is final and binding on all parties unless a federal district court issues a decision modifying the Council's decision. 42 C.F.R. § 405.1130.

124.    If the appellant files a request to bypass the Council and escalate the case to a federal district court, the ALJ's decision will act as the final decision of the Secretary. *Prime Healthcare Servs.—Montclair, LLC*, 2018 WL 333862, at *5.

### 7.    Department of Health and Human Services - Office of Inspector General

125.    The Office of Inspector General for HHS ("HHS-OIG") is tasked with oversight of HHS, including CMS, for purposes of "preventing fraud and abuse and promoting economy, efficiency, and effectiveness of HHS programs and operations." HHS-OIG, Statement of Organization, Functions, and Delegations of Authority, 83 Fed. Reg. 55553, 55553 (Nov. 6, 2018);

*see also* 5a U.S.C. § 2 (stating the purposes for establishment of HHS-OIG and other Offices of Inspector General for various departments and agencies).

126.    HHS-OIG carries out this oversight role objectively. *See* 83 Fed. Reg. 55553 at 55553; *see also* HHS-OIG, *About OIG*, https://oig.hhs.gov/about-oig/ (last visited Dec. 13, 2022).

127.    In its role as an oversight agency, HHS-OIG has dual reporting obligations to the Secretary and to Congress. HHS-OIG, *HHS-OIG Fact Sheet*, https://oig.hhs.gov/documents/root/1037/About-OIG-Fact-Sheet-June2022.pdf (last updated June 2022).

128.    HHS-OIG's oversight role includes "recommend[ing] policies for . . . the purpose of promoting economy and efficiency in the administration of, or preventing and detecting fraud and abuse in, [HHS'] programs and operations[.]" 5a U.S.C. § 4(a)(3); *see also id.* § 2(2) (stating that HHS-OIG was established, in part, to "recommend policies for activities designed (A) to promote economy, efficiency, and effectiveness in the administration of, and (B) to prevent and detect fraud and abuse in, [HHS].").

129.    While the recommendations made and reports issued by HHS-OIG in its oversight role are non-binding, CMS looks to these reports and recommendations for policy direction and appropriate implementation of operations. *See id.* § 4(a)(3) (requiring HHS-OIG to "*recommend policies*") (emphasis added); *Id.* § 5(a)(3), (15)–(16) (requiring HHS-OIG, generally, to curate a list of outstanding recommendations); *see also* HHS-OIG, *OIG's Top Unimplemented Recommendations: Solutions to Reduce Fraud, Waste, and Abuse in HHS Programs* (Dec. 2022), https://oig.hhs.gov/reports-and-publications/compendium/files/compendium2022.pdf    (listing recommendations most likely to positively affect cost savings, program effectiveness, and public health and safety, and noting that the "publication is responsive to requirements of the Inspector

General Act."). *But see* 5a U.S.C. § 4(a)(1) (granting HHS-OIG the "duty and responsibility" to "*provide policy direction* for . . . audits and investigations") (emphasis added); *see, e.g.*, HHS-OIG, *Semiannual Report to Congress: October 1, 2021 - March 31, 2022* (June 6, 2022), https://oig.hhs.gov/reports-and-publications/archives/semiannual/2022/2022-spring-sar.pdf (discussing the number of recommendations implemented by fiscal year).

### B.   Medicare Administrative Appeals Process

130.   If a Medicare provider or supplier wishes to appeal a UPIC post-payment claim denial and MAC determination of an overpayment, they are subject to the lengthy appeals process set forth in 42 U.S.C. § 1395ff. The Medicare appeals regulations allow for five levels of appeal as follows:

#### 1.   Level One: Redetermination

131.   After the initial determination that an overpayment has been made, a denied claim may be submitted to a MAC for redetermination. 42 U.S.C. § 1395ff(a)(3)(A). In the case of a denied claim by a UPIC, the determination is sent back to the MAC for re-review.

132.   Upon receipt of the request for redetermination, the MAC has sixty days to issue a decision. *Id.* § 1395ff(a)(3)(C)(ii).

#### 2.   Level Two: Reconsideration

133.   If the redetermination is unfavorable, the appealing party may submit a request for reconsideration. *Id.* § 1395ff(b), (c).

134.   A reconsideration is a review of the MAC's redetermination conducted by a QIC. *Id.* §1395ff(c)(B)(i).

135.   Upon receipt of the request for reconsideration, the QIC has sixty days to issue a decision. *Id.* § 1395ff(c)(3)(C)(i).

### 3. Level Three: ALJ Hearing

136.    A party that is dissatisfied with the QIC's reconsideration may request a hearing and *de novo* review before an ALJ with OMHA, provided the amount in controversy is met. *Id.* § 1395ff(b)(1)(E).

137.    The requisite minimum amount in controversy at the time Heart to Heart Fort Worth requested an ALJ hearing in the Calendar Year 2021 was $180. CMS, Medicare Appeals; Adjustment to the Amount in Controversy Threshold Amounts for Calendar Year 2021, 85 Fed. Reg. 60795, 60795 (Sept. 28, 2020).

138.    Under 42 U.S.C. § 1395ff(d)(1)(A), the ALJ must conduct and conclude the hearing and render a decision no later than 90 days after the request for a hearing was filed. *See also* 42 C.F.R. § 405.1016(a).

### 4. Level Four: Medicare Appeals Council Review

139.    The final administrative option for appeal of an unfavorable decision occurs with the Council. 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. § 405.1108(a).

140.    A party dissatisfied with an ALJ's decision may request review by the Council, or the Council may decide on its own motion to review an ALJ decision (often after a referral from the AdQIC). 42 C.F.R. §§ 405.1102(a)(1), 405.1110; Medicare Claims Processing Manual, CMS Pub. 100-04, Ch. 29 § 340.1.

141.    Under 42 C.F.R. § 405.1100(c), Council undertakes a *de novo* review and issues a decision, dismissal, or remands the case to the ALJ within 90 days of receipt of the request for Council review.

### 5.    Level Five: Federal District Court and Escalation

142.    If Council does not issue a decision, dismissal, or remand within 90 days, the appealing party may file a request to escalate the case to federal district court for judicial review. 42 C.F.R. § 405.1132(a).

143.    Upon Council's receipt of the escalation request, Council has five days to issue a decision, dismissal, remand, or provide notice that it is unable to do so. *Id.*

144.    Guidance issued by HHS provides that the appellant party may escalate the appeal to federal court if the adjudication period for the Council to complete its review has elapsed and the Council is unable to issue a decision, dismissal, or remand the case to OMHA. CMS, *Fifth Level of Appeal: Judicial Review in Federal District Court* (Jan. 6, 2022), https://www.cms.gov/Medicare/Appeals-and-Grievances/OrgMedFFSAppeals/Review-Federal-District-Court.

## VI.    STATISTICAL SAMPLING AND EXTRAPOLATION

### A.    The Origins of CMS' Use of Statistical Sampling and Extrapolation

145.    In 1986, through CMS Ruling 86–1, Use of Statistical Sampling to Project Overpayments to Medicare Providers and Suppliers (Feb. 20, 1986), the Health Care Finance Administration ("HCFA"), which was the predecessor to CMS, approved the use of statistical sampling and extrapolation in determining whether there has been an overpayment and in calculating the total amount of any overpayment. Further information regarding CMS Ruling 86-1 is set forth in Section VI.B below.

146.    In 1996, Congress created the Medicare Integrity Program to strengthen the Secretary's ability to deter fraud and abuse. *See* Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104–191, §§ 201–02, 110 Stat.1936, 1992–98 (codified at 42 U.S.C. §§ 1395i(k)(4), 1395ddd).

28

147.    Under the Medicare Integrity Program, Congress has authorized the Secretary to "use extrapolation to determine overpayment amounts to be recovered," but in approving the Secretary's use of "extrapolation" in determining Medicare overpayments, Congress provided limited guidance on how the extrapolation was to be performed. *See* 42 U.S.C. § 1395ddd(f)(3)(A).

148.    In 2000, to carry out the congressional objective on using extrapolation, CMS set forth its Medicare guidelines for statistical sampling and overpayment estimation in the MPIM.

149.    In 2003, Congress' Medicare Prescription Drug, Improvement, and Modernization Act amended the statutory provisions governing overpayment recovery and placed restrictions on the circumstances in which contractors could use extrapolation to calculate the amount a provider or supplier had been overpaid. *See* Pub. L. No. 108–173, §§ 911, 935, 117 Stat. 2066, 2378–86, 2407–11 (codified at 42 U.S.C. §§ 1395kk–1, 1395ddd).

150.    The Medicare Modernization Act mandated that before using extrapolation to determine overpayment amounts to be covered by recoupment, offset, or otherwise, there must be a determination of "sustained or high level of payment error, or documented educational intervention has failed to correct the payment error." *See* 42 U.S.C. § 1395ddd(f)(3).

151.    In December 2006, Congress' Tax Relief and Healthcare Act amended the statutory provisions to add a new subsection. *See* Pub. L. 109-432, Div. B, Title III, § 302(a), 120 Stat. 2991 (codified at 42 U.S.C. § 1395ddd(h)).

152.    Since June 2020, through the full timeframe of the audit and until present, there has been a requirement set forth in 42 U.S.C. § 1395ddd(h) for contractors to identify underpayments as well as overpayments. *See* Pub. L. 109-432; Pub. L. 111-148, Title VI, § 6402(j)(1); Pub. L. 114-10, Title V, § 505(b); Pub. L. 114-115.

153.    "Underpayments" refers to non-payments where an applicable law requires payment by CMS to a provider; or to payments of less than the amount owed by CMS to a provider according to applicable law. *See, e.g.*, 20 C.F.R. § 416.536.

154.    As set forth in further detail above in Section IV, to the extent a conflict exists between requirements set forth in a statute or regulation and those in the MPIM, the statute or regulation will govern.

**B.      Intent of CMS Ruling 86-1**

155.    CMS Ruling 86-1 was the first ruling that allowed a fiscal intermediary to use sampling and extrapolation versus claim-by-claim review.

156.    CMS Ruling 86-1 provides that sampling for extrapolation purposes "only creates a presumption of validity as to the amount of an overpayment which may be used as the basis for recoupment." CMS Ruling 86-1 at 11.

157.    Following an overpayment determination based on extrapolation, the burden shifts to the Medicare provider or supplier, who "could attack the statistical validity of the sample, or . . . could challenge the correctness of the determination in specific cases identified by the sample[.]" *Id.*

158.    Despite citing no statutory or regulatory authority within the ruling, CMS Ruling 86-1 asserted that the use of sampling and extrapolation grew out of the government's supposed federal common law right to recover property.

159.    As explained in that ruling, the funds used to pay Medicare claims "belong to the public," and CMS "has the fundamental obligation to ensure that Federal funds are spent only for those purposes permitted by law." *Id*. at 4.

160.    The Secretary concluded that sampling provides the only feasible means for protecting the Medicare Trust Fund in situations where a provider or supplier is suspected of

overbilling and the number of claims involved is large. *See Hammad v. Azar*, No. 17-cv-288, 2021 WL 1216383, *1 (N.D. Fla. Jan. 15, 2021) (discussing CMS Ruling 86-1); *Chaves Cnty. Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914, 915–16 (D.C. Cir. 1991) (citing CMS Ruling 86-1 at 10).

161.    CMS emphasized that providers and suppliers should and would have a fair opportunity to contest adverse determinations based on statistical sampling: "Sampling does not deprive a provider of its rights to challenge the sample, nor of its rights to procedural due process." CMS Ruling 86-1 at 11.

### C.    HHS-OIG Oversight Role

162.    As discussed above at Section V.A.7 of this Complaint, HHS-OIG is tasked with objective oversight of HHS, including CMS.

163.    In this role, HHS-OIG reviews existing and proposed legislation and regulations and oversees the implementation of legislation and regulations, including rules governing statistical sampling and extrapolation. *See* 5a U.S.C. § 4(a)(2) (granting HHS-OIG the duty "to review existing and proposed legislation and regulations relating to [HHS] and operations of [HHS]"); *see also* HHS-OIG, *Medicare Contractors Were Not Consistent in How They Reviewed Extrapolated Overpayments in the Provider Appeals Process*, A-05-18-00024 (Aug. 2020) (auditing the Medicare claims appeal process and providing recommendations with which CMS concurred).

164.    Moreover, HHS-OIG has the "duty and responsibility" to "provide policy direction for . . . audits and investigations," including policies relevant to statistical sampling and extrapolation. 5a U.S.C. § 4(a)(1).

### D.    Intent of MPIM Chapter 8.4

165.    MPIM, Chapter 8, Section 4, provides detailed requirements for CMS contractors in developing an audit plan and executing the sampling and extrapolation process.

166.    MPIM, Chapter 8, Section 4 applies to UPICs, recovery audit contractors, the supplemental medical review contractor, and MACs (including Durable Medical Equipment MACs). MPIM Ch. 8, § 8.4.

167.    There have been multiple revisions to the MPIM since its inception in 2000, but for purposes of this proceeding, the version of the MPIM that was in effect at the time of the audit of Plaintiff's Medicare claims provides the standards for proper execution of the sampling and extrapolation process. *See, e.g., Hammad*, 2021 WL 1216383, at *2 (N.D. Fla. Jan. 15, 2021).

168.    The MPIM's guidelines are provided to ensure "that a sufficient process is followed when conducting statistical sampling to project overpayments." MPIM Ch. 8, § 8.4.1.1.

169.    MPIM guidelines on sampling and extrapolation are intended to strike a balance between precise estimates that may not be "administratively or economically feasible for contractors performing audits" and the need to ensure that "the provider/supplier is treated fairly despite any imprecision in the estimation." *See Rio*, 2019 WL 1411805 at *29.

170.    Ultimately, while CMS does not require its contractors to use particular statistical practices and gives its contractors some leeway to make errors in their methodology, the test is whether the methodology is statistically valid, and the cumulative effect of several otherwise allowable errors may render a statistical extrapolation invalid. *See Cent. La.*, 2018 WL 7888523, at *16-*20 ("[F]ailure to adhere to several or all of these safeguards should eliminate the presumption that the statistical analysis is valid.").

### E.    Eight Mandatory Steps of Statistical Sampling and Extrapolation

171.    MPIM Chapter 8.4 sets forth "[t]he major steps in conducting statistical sampling," and articulates a number of criteria that govern the specifics of each step in the extrapolation process. *See* MPIM Ch. 8, § 8.4.1.3.

172.    Under the version of MPIM Ch. 8, § 8.4.1.3. applicable during the statistical sampling and extrapolation at issue in this matter, the eight mandatory steps were:

1. Identifying the provider/supplier;

2. Identifying the period to be reviewed;

3. Defining the universe (target population) and the sampling unit, and constructing the sample frame;

4. Assessing the distribution of the paid amounts in the sample frame to determine the sample design; it is very likely that the distribution of the overpayments will not be normal. However, there are many sampling methodologies (for example, use of the Central Limit Theorem) that may be used to accommodate non-normal distributions. The statistician should state the assumptions being made about the distribution and explain the sampling methodology selected as a result of that distribution;

5. Performing the appropriate assessment(s) to determine whether the sample size is appropriate for the statistical analyses used, and identifying, relative to the sample size used, the corresponding confidence interval;

6. Designing the sampling plan and selecting the sample from the sample frame;

7. Examining each of the sampling units and determining if there was an overpayment or an underpayment; and

33

8. Estimating the overpayment. When an overpayment has been determined to exist, the contractor shall follow applicable instructions for notification and collection of the overpayment, unless otherwise directed by CMS.

173. In order for the contractor to carry its burden to demonstrate that the probability sample and, by extension, the extrapolation was valid, the contractor must show satisfactory compliance with each of these eight major steps. *See, e.g., Hammad*, 2021 WL 1216383, at \*2 (noting that, in conducting a post-payment audit, CMS has promulgated guidelines that contain [these] requirements for sampling and overpayment estimation").

**F. Improper Removal of Zero-Paid Claims**

**1. The Sampling Process and the MPIM**

174. Pursuant to MPIM Ch. 8, § 8.4.3.2, "[t]he universe and sample frame will cover claim lines or line items for the period under review."

175. "The universe includes all claim lines that meet the selection criteria." MPIM Ch. 8, § 8.4.3.2.

176. Once the sampling unit is selected, certain limiting criteria are then applied to the universe. "The sample frame is the listing of sample units, derived from the universe, from which the sample is selected." *Id*.; *see also* § 8.4.3.2.3.

177. Once the sampling plan is selected, the sampling units are chosen randomly from the frame or strata frame through use of a computer program.

178. Once the sample is constructed, each sampling unit is audited by the contractor's medical review staff to determine whether the claim was properly paid, overpaid, underpaid, or an improperly denied payment.

179.    Upon completion of the medical record review, the contractor's staff will calculate the net average amount by which the provider or supplier was overpaid for the sampled claims by reducing the overpayment amount by the underpayment amount.

180.    This actual average overpayment amount, the net overpayment on the sample set, is then projected to the sample frame of that provider or supplier's claims to form the extrapolated net overpayment amount.

181.    In order for the above process to function properly and not be biased against the provider or supplier, underpayments, including zero-paid claims, must be present in the universe, sample frame, and sample to ensure the actual net overpayment is calculated.

182.    "Zero-paid" claims are fully adjudicated claims for which the payment amount was zero.

183.    In contrast, "Unpaid" claims are claims which have been submitted for payment but for which no payment has been made because they have not yet been adjudicated.

184.    An MPIM-compliant universe "shall consist of all fully and partially paid claims submitted by the provider/supplier for the period under review." MPIM Ch. 8, § 8.4.3.2.1.

185.    "Paid" in MPIM Ch. 8, § 8.4.3.2.1 is not referring to a monetary amount but rather the act of adjudication (i.e., an original determination either on the whole claim or some of the claim lines).

186.    Pursuant to MPIM Ch. 8, § 8.4.3.2.1, "Sample units with no final payment [*i.e.*, 'unpaid claims'] made at the time of sample selection should not be included in the sample frame."

187.    Under MPIM Ch. 8, § 8.4.1.3, an auditor is instructed to "[e]xamin[e] each of the sampling units and determin[e] if there was an overpayment or an underpayment."

188.    Further, under MPIM Ch. 8, § 8.4.7.1, "the explanation of the sampling methodology that was followed shall include … [t]he amount of the actual overpayment/underpayment from each of the claims reviewed."

189.    MPIM Ch. 8, § 8.4.6.3 requires that "[t]he contractor shall document … [t]he amount of all overpayments and underpayments and how they were determined."

190.    Moreover, during the medical review process, any "[s]ampling units that are found to be underpayments, in whole or in part, are recorded as negative overpayments and shall be used in calculating the estimated overpayment." *Id*. § 8.4.5.2.

##    2.    HHS-OIG Policy

191.    HHS-OIG has expressly indicated, in the context of Corporate Integrity Agreements ("CIAs"), that Independent Review Organizations ("IROs") performing audit work must include underpayments to calculate the net overpayment in setting the actual overpayment owed under CIAs. *See, e.g.*, HHS-OIG, *Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and Kevin P. Greene, M.D. and Feel Well Health Center of Southington, P.C.,* App'x B, at 1 (Nov. 8, 2022), https://www.oig.hhs.gov/fraud/cia/agreements/Kevin_P_Greene_MD_and_Feel_Well_Health_C enter_of_Southington_PC_11082022.pdf (stating that a "net Overpayment shall be calculated by subtracting all underpayments identified in the Claims Review Sample from all Overpayments identified in the Claims Review Sample"); *see also* Laura Ellis, *CIA Changes on the Horizon: What They Are and What They May Mean For You*, Speech at Am. Health L. Assoc. Conference (Sept. 29, 2022) (discussing this shift in policy for CIAs in her capacity as Senior Counsel in the Office of Counsel to HHS-OIG).

192.    This change by HHS-OIG is reflected in the definition of "Error Rate" utilized in the CIAs it enters with providers.

193.    Previously, HHS-OIG had instructed IROs to calculate an Error Rate for CIA purposes "by dividing the Overpayment in the Claims Review Sample by the total dollar amount associated with the Paid Claims in the Claims Review Sample." *See, e.g.*, HHS-OIG, *Corporate Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and VirtuOx, Inc.*, App'x B, at 5 (May 11, 2022), https://www.oig.hhs.gov/fraud/cia/agreements/VirtuOx_Inc_05112022.pdf.

194.    Now, HHS-OIG has updated its policy to expressly require the inclusion of underpayments—including zero-paid claims—re-defining "Error Rate" as "the percentage of net Overpayments identified in the Claims Review Sample. The net Overpayment shall be calculated *by subtracting all underpayments identified* in the Claims Review Sample from all Overpayments identified in the Claims Review Sample." *See, e.g.*, HHS-OIG, *Corporate Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and CHC-FLA, LLC*, App'x B, at 1z (Sept. 26, 2022), https://www.oig.hhs.gov/fraud/cia/agreements/CHC-FLA_Inc_09262022.pdf (emphasis added).

## G.    Defining the Universe and Recreating the Sample Frame

195.    As previously explained, for purposes of extrapolation, the "target universe" of a provider or supplier's Medicare claims consists of all claim lines that meet the selection criteria submitted by the provider or supplier within the chosen time period. *See* MPIM Ch. 8, §§ 8.4.3.1, 8.4.3.2.

196.    An MPIM-compliant universe "shall consist of all fully and partially paid claims submitted by the provider/supplier for the period under review." *Id.* § 8.4.3.2.1.

197.    More specifically, pursuant to MPIM Ch. 8, § 8.4.7.1, when a contractor seeks to recover an overpayment it shall include, in the overpayment demand letter, information about the review and statistical sampling methodology that was utilized for estimation which shall include:

- A description of the universe, the sample frame, and the sample methodology

- A definition of the sampling unit,

- The sample selection procedure followed, and the numbers and definitions of the strata and size of the sample, including allocations, if stratified;

- The time period under review;

- The overpayment estimation, the overpayment estimation methodology, and the calculated sampling error;

- The amount of the actual overpayment/underpayment from each of the claims reviewed; [and]

- [A] list of any problems/issues identified during the review and any recommended corrective actions.

198.    The purpose of these documentation requirements is to ensure that the sample frame and the sample can be recreated in the event that the methodology is challenged.

199.    More specifically, as set forth in MPIM Ch. 8, § 8.4.4.2, the contractor "shall document all steps taken in the random selection process exactly as done to ensure that the necessary information is available for anyone attempting to replicate the sample selection."

200.    Additionally, as set forth in MPIM Ch. 8, § 8.4.4.4.1, "[a]n explicit statement of how the universe is defined and elements included shall be made and maintained in writing" and "documentation shall be kept in sufficient details so that the sample frame can be re-created should the methodology be challenged."

201.    Where an auditor creates a targeted sample frame that has been filtered down by limiting criteria, a provider must be provided with the unfiltered claims data from the universe in order to properly recreate the sampling process, including the sample frame. *See* CMS Ruling 86-

1; MPIM Ch. 8, § 8.4.4.4.1 ("Sufficient documentation shall be kept so that the **sample frame can be re-created**, should the methodology be challenged") (emphasis added).

202.    A failure to comply with the MPIM mandate to carefully document, preserve, and produce a statistical sampling and extrapolation from start to finish denies a provider/supplier the Due Process right to recreate the process to determine if it was performed correctly and determine if a valid challenge should be raised. *See Global Home Care, Inc. v. National Government Services*, Docket No. M-11-116, HHS, DAB (Jan. 11, 2011) (holding that "[w]ithout this basic documentation, a provider does not have the information and data necessary to mount a Due Process challenge to the statistical validity of the sample, as is its right under CMS Ruling 86-1").

203.    Where a provider or supplier is denied its Due Process right to dispute and contest an extrapolated overpayment, a provider/supplier is not extended appeal rights in accordance with 42 U.S.C. § 1395ff(b), and the provider or supplier is also deprived of the statutory protection against premature recoupment under 42 U.S.C. § 1395ddd(f)(2).

204.    In other words, a "failure to supply the provider with sufficient documentation to recreate the sample frame and sample effectively deprives the provider of its right to challenge the statistical validity of the sample and thus may constitute a ground for invalidating the overpayment extrapolation." *LivinRite v. Azar*, 386 F. Supp. 3d 644, 654 (E.D. Va. 2019).

**H.    Documentation of Recalculated Demand**

205.    "If the decision on appeal upholds the sampling methodology but reverses one or more of the revised initial claim determinations, the estimate of overpayment shall be recomputed and a revised estimation of the overpayment issued." MPIM Ch. 8, § 8.4.9.2.

206.    The contractor then must "include in the overpayment demand letter information about the review and statistical sampling methodology that was followed." *Id.* at Ch. 8, § 8.4.7.1.

207.    In addition, the contractor must maintain complete documentation of the sampling methodology that was followed in recalculating the overpayment. *Id.* at Ch. 8, § 8.4.4.4.

208.    As with the initial statistical sampling and extrapolation methodology, the purpose of these documentation requirements in recalculation is to ensure that the sample frame and the sample can be recreated in the event that the recalculation methodology is challenged. *Id.* at Ch. 8, § 8.4.4.4.1.

209.    A failure to comply with the MPIM mandate to carefully document, preserve, and produce a statistical sampling and extrapolation from start to finish for a recalculated overpayment demand denies a provider/supplier the Due Process right to recreate the process to determine if it was performed correctly and determine if a valid challenge should be raised. *See Global Home Care*, Docket No. M-11-116 (holding that "[w]ithout this basic documentation, a provider does not have the information and data necessary to mount a Due Process challenge to the statistical validity of the sample, as is its right under CMS Ruling 86-1").

210.    Where a provider or supplier is denied its Due Process right to dispute and contest an extrapolated overpayment—including a recalculated overpayment—a provider/supplier is not extended appeal rights in accordance with 42 U.S.C. § 1395ff(b), and the provider or supplier is also deprived of the statutory protection against premature recoupment under 42 U.S.C. § 1395ddd(f)(2).

## VII.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

211.    Heart to Heart Fort Worth seeks judicial review of the Secretary's extrapolated overpayment demand plus interest assessed on claims submitted by Heart to Heart Fort Worth, and previously paid by Medicare, for services rendered between June 15, 2016 and October 31, 2016 and claims paid between June 15, 2016 and May 22, 2020 (the "Review Period").

## A. UPIC Post-Payment Audit

212.    On June 19, 2020, Qlarant Integrity Solutions, LLC ("Qlarant"), the Southwestern UPIC, requested medical records from Heart to Heart Fort Worth to perform a post-payment review.

213.    In August 2020, Heart to Heart Fort Worth responded to the UPIC's request and provided the requested medical records.

214.    On November 13, 2020, Qlarant sent prior counsel for Heart to Heart Fort Worth a letter alleging that Heart to Heart Fort Worth had received Medicare payments in error ("Initial Overpayment Letter"), based on their audit of sample claims submitted by Heart to Heart Fort Worth, and previously paid by Medicare during the Review Period (hereinafter "Fort Worth 1707").[3]

215.    Qlarant's correspondence also included an encrypted CD purportedly containing "[a]ll information regarding the medical review."

216.    The CD contained: 1) Qlarant's Medical Review Detail; 2) Provider Education document; 3) Qlarant's Sampling Methodology ("SSOE"); 4) the "Universe"; 5) Financial Sheet; and 6) a November 13, 2020 Letter re Notice of Termination of Suspension of Medicare Payments.[4]

---

[3] In total, Qlarant conducted four audits of Heart to Heart Fort Worth's claims, and issued four separate overpayment letters on November 13, 2020, which are the subject of four separate federal complaints being filed concurrently in this District.

[4] For each of the Heart to Heart Fort Worth audits performed, Qlarant produced a CD with similar contents.

217.    With regard to the "Universe," the CD included an excel file entitled "Heart to Heart Ft Worth_671505_Universe_Revised.xlsx,"[5] but this excel file did not contain the actual universe of claims on which the overpayment was determined.

218.    Rather, the purported universe file included only the claim lines for the sampling frame, not all the claims from the review period from which the sampling frame had been created.

219.    Specifically, the SSOE indicated that the Universe Qlarant selected was limited to "all final paid claims and associated claim lines from Shared Systems Data, paid by UPIC SW MACs . . . for which [Heart to Heart Fort Worth] billed for services rendered between June 15th, 2016 and October 31[st], 2016 and claims paid between June 15th, 2016 and May 22nd, 2020." SSOE at 2.

220.    The Universe also expressly the excluded claims from the period of review that had been previously reviewed in another audit: "[t]he Universe was further restricted to exclude claims from a previous sample conducted by Qlarant," *Id*.

221.    Qlarant then defined the sampling frame, consisting of 238 claims totaling $1,008,962.21, noting that two claims were placed in a "Certainty Stratum based on the paid amount being greater than $7000" and the "remaining claims in the Sampling Frame with paid amount greater than $0 and less than or equal to $7000 were placed in Stratum 1." *Id*. at 4.

222.    The SSOE further indicated that Qlarant randomly selected 30 claims from the 236 claims in Stratum 1, and included two claims in the Certainty Stratum, which was not randomly selected. *Id*. at 6.

---

[5] Although the purported "Universe" Excel files for the different Heart to Heart Fort Worth audits have the same or similar names, the universes for each of these audits involves a different set of claims.

223.    Based on Qlarant's audit of a total sample of 32 claims, it found 28 sampling units in error, which allegedly created an error rate of 87.50% based on sampling units in error, and an overall error rate of 81.68% based on overpayment amount, which totaled an actual overpayment of $116,765.83. *Id*. at 12.

224.    The Initial Overpayment Letter indicated that this actual overpayment resulted in an extrapolated overpayment of $855,963.00.

225.    On November 20, 2020, Palmetto GBA ("Palmetto"), the MAC for Jurisdiction M, issued an overpayment demand in the amount of $855,963.00 ("Demand Letter") to Heart to Heart Fort Worth.

**B.    Level One: Redetermination**

226.    On December 7, 2020, Heart to Heart Fort Worth sent Palmetto 28 individual Requests for Redetermination for sample claims from the Fort Worth 1707 audit in response to the Demand Letter (the "Redetermination Requests").

227.    In its individual Redetermination Requests, Heart to Heart Fort Worth appealed each of the individual claims that were denied for not meeting the Medicare guidelines, and provided additional documentation to support that the services were appropriately ordered and issued to the Medicare beneficiaries.

228.    These individual Redetermination Requests included appeals for the following sample claims:

(1)    Claim for beneficiary A.A. for services provided from October 1, 2016 to October 31, 2016 ("A.A. Fort Worth 1707 Claim");

(2)    Claim for beneficiary C.S. for services provided from September 1, 2016 to September 30, 2016 ("C.S. Fort Worth 1707 Claim"); and

(3)    Claim for beneficiary J.L. for services provided from October 1, 2016 to October 10, 2016 ("J.L. Fort Worth 1707 Claim").

229.     From February 3, 2021 through February 17, 2021, Palmetto sent Heart to Heart Fort Worth three Redetermination Decisions for multiple beneficiaries for Fort Worth 1707, issuing a favorable disposition for one claim, and unfavorable dispositions for 27 claims, which reduced the sampling units in error to 27 out of 32 in the sample set, and reduced the approximate error rate to 84.38%.

230.     In its Redetermination Decision, identified as File No. 1-9761138436, and dated February 17, 2021, Palmetto issued unfavorable decisions for the following claims (among others): (1) A.A. Fort Worth 1707 Claim, (2) C.S. Fort Worth 1707 Claim, and (3) J.L. Fort Worth 1707 Claim (collectively, the "Unfavorable Redetermination Decisions").

### C.     Level Two: Reconsideration

231.  On April 27, 2021, Heart to Heart Fort Worth timely submitted individual Requests for Reconsideration for the 27 claims still in dispute to the QIC, C2C Solutions, Inc. ("C2C"), in response to Palmetto's Unfavorable Redetermination Decisions.

232.     In its individual Reconsideration Requests, Heart to Heart Fort Worth appealed each individual claim that was denied for not meeting the Medicare guidelines, and provided documentation supporting that the services were appropriately ordered and issued to the Medicare beneficiaries.

233.     These individual Reconsideration Requests included appeals for: (1) A.A. Fort Worth 1707 Claim, (2) C.S. Fort Worth 1707 Claim, and (3) J.L. Fort Worth 1707 Claim, each with a consolidated Appeal number of 1-9761138436.

234.     From July 30, 2021 through January 28, 2022, C2C issued individual Reconsideration Decisions based on each individual claim, issuing favorable dispositions for nine claims, and unfavorable dispositions for 18 claims for Fort Worth 1707, which reduced the

sampling units in error to 18 out of 32 in the sample set, and reduced the approximate error rate to 56.25%.

235.    These individual Reconsideration Decisions included unfavorable decisions for the following claims, among others, that were previously consolidated, but later assigned separate appeal numbers (collectively, the "Unfavorable Reconsideration Decisions"):

(1)    A.A. Fort Worth 1707 Claim, assigned Medicare Appeal Number 1-10203283679 (dated October 1, 2021);

(2)    C.S. Fort Worth 1707 Claim, assigned Medicare Appeal Number 1-10276983169 (dated October 21, 2021); and

(3)    J.L. Fort Worth 1707 Claim, assigned Medicare Appeal Number 1-10268816617 (dated September 13, 2021).

**D.    Level Three: ALJ Hearing**

**1.    ALJ Hearing Requests**

236.    From September 8, 2021 through February 10, 2022, Heart to Heart Fort Worth timely filed 18 individual Requests for ALJ Hearing for the remaining sample claims in Fort Worth 1707, appealing each of C2C's Unfavorable Reconsideration Decisions by beneficiary claim using the separately identified appeal numbers assigned by C2C.

237.    In each of its Requests for ALJ Hearing, Heart to Heart Fort Worth stated that it also intended to challenge the statistical sampling and extrapolation methodology employed by Qlarant.

238.    At the ALJ level of appeal, Heart to Heart Fort Worth also retained Harold S. Haller, Ph.D., a professor and statistical expert in the healthcare field, to examine the statistical sampling and extrapolation methodology used by Qlarant in its twelve audits of four Heart to Heart Holdings subsidiaries, including Fort Worth 1707.

### 2.    Reduced Overpayment Amount and Request for Documentation

239.    On January 18, 2022, Alisha Smith, RN, the Director of Medical Review for the parent company of Heart to Heart Fort Worth, reached out to the overpayment supervisor with Palmetto, and asked for recalculations of any alleged overpayments assessed against Heart to Heart Fort Worth and its sister companies (Heart to Heart Houston, Heart to Heart Greater Houston, and Heart to Heart Texas), based on the favorable rulings Heart to Heart Fort Worth and its sister companies received for individual claims at the Redetermination and Reconsideration levels. *See* **Exhibit 1.**

240.    On this same date, Heart to Heart's parent company made a specific request to Palmetto to get "everything related to the re-calculation" from the UPIC, including (1) Original letters, (2) Recalculation letters, and (3) Information used to determine calculation/re-calculations. *Id*.

241.    On November 28, 2022, Alisha Smith, RN, once again reached out to the overpayment supervisor with Palmetto, noting that the refunds that Heart to Heart Fort Worth and its sister companies were receiving seemed "to be based on the original extrapolation configuration from Qlarant" and asking whether the extrapolation rate had been recalibrated based on the new and much lower denial rate. Ms. Smith then asked "If this has been done can we get something showing the new extrapolation amounts?" *See* **Exhibit 2.**

242.    Additionally, on November 15, 2023, counsel for Plaintiff sent a request to Palmetto for a complete accounting of Plaintiff's debts, to include "all interest accruals, payments made or recoupment applied, and the current outstanding balance[.]" *See* **Exhibit 3.**

243.    On November 30, 2023 and December 5, 2023, Heart to Heart Fort Worth received spreadsheets from Palmetto reflecting certain refunds and adjustments assessed based on certain

favorable decisions obtained on appeal for the sample claims of Fort Worth 1707, as well as other audits. *See* **Exhibit 4**.[6]

244.    However, as of the date of this filing, Heart to Heart Fort Worth has never received any documentation supporting the recalculated extrapolation using updated error rates for Fort Worth 1707, when it was reduced due to favorable individual claims rulings throughout the appeals process.

### 3.    ALJ Decisions

245.    Of the 18 sample claims remaining from Fort Worth 1707 appealed to the ALJ level, the ALJs issued fully favorable decisions for 14 of these claims, dismissed one request for hearing based on appellant Heart to Heart Fort Worth's alleged failure to appear, and issued three unfavorable decisions, which reduced the sampling units in error to 4 out of 32 in the sample set, and reduced the approximate error rate to 12.5%.[7]

### a)    A.A. Fort Worth 1707 Claim

246.    On August 31, 2022, ALJ Morrison issued an unfavorable ALJ Decision for Heart to Heart Fort Worth's A.A. Fort Worth 1707 Claim (assigned OMHA Appeal Number # 3-10203283679). A redacted copy[8] of this decision is attached as **Exhibit 5**.

247.    At a hearing on March 8, 2022, ALJ Morrison limited her review to the individual claim on appeal, and did not address the challenge to the validity of the statistical sampling and

---

[6] In total, Heart to Heart Holdings received individual accountings for each of the 12 audits performed by Qlarant, which included four audits of Heart to Heart Fort Worth claims, as well as audits of Heart to Heart Houston, Heart to Heart Greater Houston, and Heart to Heart Texas. These 12 accountings are included as a single attached exhibit.

[7] This error rate accounts for the dismissed claim as well as the claims denied by ALJs in the sample set.

[8] Redacted copies of all ALJ Decisions relevant to the remaining sample claims from the Fort Worth 1707 audit are attached, removing all protected health information ("PHI"). Unredacted copies of these ALJ Decisions will be included in the Administrative Record.

extrapolation for the full audit (Fort Worth 1707); however, upon information and belief, Heart to Heart Fort Worth preserved its right to challenge the statistical sampling and extrapolation methodology used to assess an overpayment for the Fort Worth 1707 audit at a later date.[9] *See generally id.*

### b)      J.L. Fort Worth 1707 Claim

248.    On December 6, 2022, ALJ Petrylak issued an unfavorable ALJ Decision for Heart to Heart Fort Worth's J.L. Fort Worth 1707 Claim (assigned OMHA Appeal Number # 3-10268816617). A redacted copy of this decision is attached as **Exhibit 6**.

249.    On April 26, 2022, at an ALJ hearing to consider the merits of this claim, Heart to Heart Fort Worth preserved its right to challenge the statistical sampling and extrapolation methodology used to assess an overpayment for the Fort Worth 1707 audit, after ALJ Petrylak limited his review to the individual claim on appeal, and refused to address the validity of the statistical sampling and extrapolation for the full audit (Fort Worth 1707). *Id.* at 2.

### c)      C.S. Fort Worth 1707 Claim

250.    On March 7, 2023, ALJ Delaney issued an unfavorable ALJ Decision for Heart to Heart Fort Worth's C.S. Fort Worth 1707 Claim (assigned OMHA Appeal Number # 3-10276983169). A redacted copy of this decision is attached as **Exhibit 7**.

251.    On January 25, 2023, at an ALJ hearing to consider the merits of this claim, Heart to Heart Fort Worth again preserved its right to challenge the statistical sampling and extrapolation methodology used to assess an overpayment for the Fort Worth 1707 audit, after ALJ Delaney limited his review to the individual claim on appeal, and refused to address the

---

[9] Although undersigned counsel does not have a copy of the recorded hearing, upon information and belief, Heart to Heart Fort Worth began each ALJ hearing by asserting on the record its challenge to the statistical sampling and extrapolation methodology.

validity of the statistical sampling and extrapolation for the full audit (Fort Worth 1707). *Id*. at 1, 3-4.

252.    ALJ Delaney reached this decision after allowing Heart to Heart Fort Worth's statistical expert, Dr. Haller, to testify at the hearing as to his opinion that Qlarant's statistical sampling and extrapolation methodology for the Fort Worth 1707 audit should be invalidated. *Id*. at 4.

**E.    Level Four: Medicare Appeals Council Review**

253.    Between October 30, 2022 and May 5, 2023, Heart to Heart Fort Worth timely and electronically filed four individual Requests with Council requesting review of the three unfavorable decisions and one dismissal for the remaining sample claims in Fort Worth 1707.

254.    The docket numbers assigned by Council for the three appeals of unfavorable ALJ decisions were, as follows:

(1)    A.A. Fort Worth 1707 Claim: docket number M-23-397 (appealed October 30, 2022);

(2)    J.L. Fort Worth 1707 Claim: docket number M-23-2112 (appealed February 3, 2023); and

(3)    C.S. Fort Worth 1707 Claim: docket number M-23-3942 (appealed May 5, 2023).

255.    On January 6, 2023, Council affirmed the ALJ's decision to dismiss the appeal for Heart to Heart Fort Worth's F.L. Fort Worth 1707 Claim (assigned docket number M-23-1579); the denial of this claim is not being appealed in this Complaint.

256.    To date, Heart to Heart Fort Worth has not received a decision, dismissal, or remand by Council for the remaining three sample claims from the Fort Worth 1707 audit.

257.    Although Heart to Heart Fort Worth has received some reimbursement based on individual claims that were allowed after appealing the Qlarant audit at the redetermination, reconsideration, and ALJ levels, as of the date of this filing, they have not received a complete

recalculation of the extrapolated overpayment based on these favorable rulings, nor documentation to support any recalculation methodology used by the UPIC, per the requirements of MPIM Ch. 8 §§ 8.4.9.2 and 8.4.7.1.

### F.     Level Five: Federal District Court and Escalation

258.     On December 12, 2023, Heart to Heart Fort Worth electronically filed three letters to Council requesting escalation to federal district court if Council was unable to timely issue decisions for the three outstanding claims in Fort Worth 1707.

259.     On December 20, 2023, after Council failed to respond within the required five-day timeframe, Heart to Heart Fort Worth electronically filed three letters to Council reiterating its intent to escalate. To date, Council has failed to respond to any of Heart to Heart Fort Worth's letters regarding its request for escalation.

## VIII.   CAUSES OF ACTION

### A.     Count One: Qlarant's Failure to Include Zero-Paid Claims in its Statistical Sampling Violated Plaintiff's Right to Due Process.

260.     Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

261.     The Secretary's decision applied improper legal standards, was not in accordance with applicable law, and warrants *de novo* review.

262.     Plaintiff has a valid property interest in receiving Medicare payments for services rendered.

263.     Qlarant improperly excluded zero-paid claims from the sample frame in conducting its statistical sampling and extrapolation for the Fort Worth 1707 audit, in violation of statutory and regulatory mandates and MPIM guidance.

264.    Failure to include zero-paid claims leads to a statistical sampling that is biased against the provider and causes the extrapolated demand to be exaggerated.

265.    This procedural failure violates Plaintiff's right to Due Process and warrants invalidation the statistical sampling, because the failure to include zero-paid claims represents a material flaw.

266.    Plaintiff is entitled to an order from this Court invalidating the extrapolation at issue.

**B.    Count Two: Qlarant's Failure to Produce the Universe of Claims in its Statistical Sampling Violated Plaintiff's Right to Due Process.**

267.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 266 as if fully set forth herein.

268.    The Secretary's decision applied improper legal standards, was not in accordance with applicable law, and warrants *de novo* review.

269.    Plaintiff has a valid property interest in receiving Medicare payments for services rendered.

270.    The Secretary and his agents failed to provide the actual, complete universe of claims used in Qlarant's statistical sampling and extrapolation for the Fort Worth 1707 audit, failed to properly define the universe, and failed to provide the information necessary to recreate the sampling frame.

271.    The Secretary and his agents willfully, deliberately, and unjustifiably withheld for over three years, and continue to withhold to date, this critical statistical information from Plaintiff.

272.    Without this statistical information, Plaintiff was deprived of its right to independently verify the Secretary and his agents' alleged overpayment amount throughout the entire administrative appeals process.

273.    This withholding of the actual, complete universe and other documentation necessary to recreate the statistical sampling and extrapolation violates Plaintiff's appeal rights under 42 U.S.C. § 1395ff(b), and also deprives Plaintiff of the statutory protection against premature recoupment under 42 U.S.C. § 1395ddd(f)(2).

274.    Plaintiff's Due Process rights under the Fifth Amendment of the Constitution have been infringed.

275.    Plaintiff is entitled to an order from this Court invalidating the extrapolation at issue.

**C.    Count Three: Failure to Provide Documentation to Support Any Recalculated Demand Violated Plaintiff's Right to Due Process.**

276.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 275 as if fully set forth herein.

277.    The Secretary's decision applied improper legal standards, was not in accordance with applicable law, and warrants *de novo* review.

278.    Plaintiff has a valid property interest in receiving Medicare payments for services rendered.

279.    Following favorable decisions issued at the Redetermination, Reconsideration, and ALJ Appeal levels for individual claims in the Fort Worth 1707 audit, the Secretary and his agents issued partial refunds based on these individual claims, but failed to properly recalculate the extrapolated overpayment demand for this audit.

280.    Defendant also failed to provide sufficient documentation to support any recalculated amounts, including any documentation or explanation as to how any new amount was recalculated and any statistical analysis and work that went into recalculating the overpayment amounts.

281. Plaintiff requested this information over a year ago from the MAC, but has yet to receive any supporting documentation for these recalculations.

282.    The Secretary and his agents' failure to recalculate any overpayment amount based on the subsequent issuance of favorable decisions for individual sample claims violates Plaintiff's Due Process rights.

283.    Further, Defendant's withholding of the documentation necessary to recreate the statistical sampling and extrapolation used in recalculating the overpayment demands:

(a)    deprives Plaintiff of its right to independently verify the recalculated overpayment amounts;

(b)    violates Plaintiff's appeal rights under 42 U.S.C. § 1395ff(b); and

(c)    violates Plaintiff's Due Process rights under the Fifth Amendment of the Constitution.

284.    Plaintiff is entitled to an order from this Court invalidating the extrapolation at issue.

**D.    Count Four: The Secretary Improperly Recouped Funds in Violation of the Social Security Act and in Violation of Plaintiff's Right to Due Process.**

285.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 284 as if fully set forth herein.

286.    Plaintiff has a valid property interest in receiving Medicare payments for services rendered.

287.    The Secretary issued a notice of the alleged extrapolated overpayment while withholding certain statistical sampling documentation it was required to provide to Plaintiff, which denied to Plaintiff its Due Process rights and a meaningful opportunity to dispute and contest the extrapolated overpayment.

288.    The Secretary has imposed recoupment of Plaintiff's Medicare payments and collected in excess of the alleged overpayment, with interest, even though Plaintiff has been deprived of a meaningful opportunity to challenge this calculation.

289.    Plaintiff is entitled to a suspension of any ongoing recoupment of the alleged overpayment, and a refund of all improperly recouped amounts and interest.

**E.     Count Five: The Secretary Improperly Accounted for Payments Made by Plaintiff and Deprived Plaintiff of Its Property and Due Process Rights.**

290.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 289 as if fully set forth herein.

291.    Plaintiff has a valid property interest in receiving Medicare payments for services rendered.

292.    The Secretary and its contractors have failed to account for, or otherwise misapplied an amount to be determined upon CMS providing a proper accounting, in payments made by Plaintiff in relation to the underlying Medicare claims appeal.

293.    This error infringed on Plaintiff's Due Process rights under the Fifth Amendment of the Constitution.

294.    The necessary, missing documentation regarding proper accounting could only be provided to Plaintiff by CMS or its contractors, as these are the only entities that could have documentation regarding the total amount recouped from Plaintiff.

295.    Plaintiff is entitled to an order mandating that the ALJs require CMS or its contractors to perform a full accounting of Plaintiff's debts related to the claims at issue from inception to present.

## IX.    PRAYER FOR RELIEF

296.    For these reasons, Plaintiff prays for judgment against Defendant for the following:

**A.    Count One.**

297.    An order from this Court invalidating the extrapolation.

298.    A declaratory judgment that Defendant has violated Plaintiff's Due Process rights.

**B.    Count Two.**

299.    An order from this Court invalidating the extrapolation.

300.    A declaratory judgment that Defendant has violated Plaintiff's Due Process rights.

**C.    Count Three.**

301.    An order from this Court invalidating the extrapolation.

302.    A declaratory judgment that Defendant has violated Plaintiff's Due Process rights.

**D.    Count Four.**

303.    A suspension of any ongoing recoupment of the alleged overpayment.

304.    A refund of all improperly recouped amounts and interest therefrom.

305.    A declaratory judgment that Defendant has deprived Plaintiff of the statutory protections against premature recoupment under 42 U.S.C. §1395ddd(f)(2).

**E.    Count Five.**

306.    An order from this Court requiring CMS or its contractors to perform a full accounting of Plaintiff's debts related to the claims at issue from inception to present.

307.    A declaratory judgment that Defendant has violated Plaintiff's Due Process rights.

**F.    Additional Relief Requested.**

308.    Prejudgment and post-judgment interest;

309.    Reasonable attorney's fees and costs of suit; and

310.    Such other and further relief as the Court may deem just and proper under law.

Dated: January 5, 2024                    Respectfully Submitted,

                                          _/s/ Beth W. Petronio_____
                                          Beth W. Petronio
                                          Texas Bar No. 00797664
                                          Beth.Petronio@klgates.com
                                          K&L GATES LLP
                                          1717 Main Street, Suite 2800
                                          Dallas, TX 75201
                                          Telephone: 214-939-5500
                                          Facsimile: 214-939-5849

                                          *Counsel for Plaintiff*